Case 4:21-cv-01474   Document 26   Filed on 01/21/22 in TXSD   Page 1 of 13

United States District Court
Southern District of Texas
**ENTERED**
January 24, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMBER ELKINS PH D, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-01474 |
| | § | |
| CHRISTIAN WERNZ, | § | |
| | § | |
| Defendant. | § | |

## **MEMORANDUM & ORDER**

Before the Court is the Motion to Dismiss filed by Defendant Dr. Christian Wernz ("Wernz"). (Doc. 19.) The Court held a hearing on the Motion on January 21, 2022. At the hearing, the Court ruled from the bench. The Court provides this Memorandum and Order to further document its rulings and reasoning.

**I.   BACKGROUND**

Plaintiff Dr. Amber Elkins' Complaint alleges as follows. Elkins was a research scientist in Texas A&M's Department of Veterinary Pathobiology. (Doc. 1 at ¶ 5.) She decided to seek a new position and posted her resume on LinkedIn. (*Id.* at ¶ 7.) Wernz, an Associate Professor at Virginia Commonwealth University ("VCU"), was among those who responded. (*Id.* at ¶¶ 6–9.) Wernz messaged Elkins and told her that she would "be a great fit" for VCU's "exciting new analytics initiatives." (*Id.* at ¶ 9.) Elkins and Wernz eventually met via Zoom. (*Id.* at ¶¶ 9–11.) Wernz began the Zoom meeting by saying "look at you," and "then immediately offered [Elkins] a position." (*Id.* at ¶ 11.)

1

Elkins, for her part, did not accept Wernz's offer at first because she was still considering other jobs. (*Id.*) So Wernz invited Elkins to visit VCU. (*Id.* at ¶¶ 12–13.) Elkins agreed and traveled to Richmond, Virginia, where she delivered a lecture on VCU's campus. (*Id.* at ¶ 15.) Afterwards, Wernz pressed Elkins for terms on which she would accept the position. (*Id.* at ¶ 16.) Elkins responded that stable funding was critical. (*Id.*) Wernz then told Elkins that he had secured funding such that he could "guarantee" the first two years of Elkins' position. (*Id.*) Wernz also said that he could "guarantee" that Elkins could move from the research position into a tenure-track position later if she desired. (*Id.*) Over time, Wernz also became more insistent about Elkins coming to VCU, pressuring her "to sign a contract by email, telephone and text messages." (*Id.* at ¶ 18.) Elkins continued to hold out, however, because "she had been planning a move for almost seven years and wanted to make sure that the position that she committed to had secure funding, was well paid, was located in a pleasant area, and would enhance her professional growth." (*Id.*) Eventually, Elkins flew to Richmond to explore potential housing options. (*Id.* at ¶ 21.)

After some additional back-and-forth, Wernz presented Elkins with a contract that ended on a specific date: November 9, 2020. (*Id.* at ¶ 23.) Elkins "expressed alarm," since she had communicated to Wernz that permanent job stability would play a key role in her decision. (*Id.*) Wernz, however, told Elkins "to pay no attention to the end date in the contract since [he] had already secured funding for the next two years and would replace the existing contract in a few days[.]" (*Id.*) Taking Wernz at his word, Elkins flew back to Richmond to find a place to live. (*Id.* at ¶ 24.) During that visit, Wernz bought Elkins several drinks at a bar. (*Id.*) The two later "became intimate" in her hotel room. (*Id.*) After Elkins returned to Texas, she accepted the job. Elkins says she would not have agreed to the contract but-for Wernz's representations regarding the long-term

nature of the position. (*Id.* at ¶ 23.) Wernz then flew to Texas to drive Elkins and her possessions to Virginia. (*Id.* at ¶¶ 25–26.)

After arriving in Richmond, Elkins bought a house close to VCU's campus. (*Id.* at ¶ 29.) Less than a month after Elkins started work, however, Wernz informed her "that the funding for the majority of her salaried position had been withdrawn and that there would be no funds available to pay her" for longer than eight months. (*Id.* at ¶ 30.) Because this admission contradicted Wernz's promises about the long-term nature of the job, Elkins filed this action for actual and constructive fraud against Wernz. (*Id.* at ¶¶ 31–53.)

Wernz filed his first motion to dismiss on June 25, 2021, claiming that the Court lacked personal jurisdiction over him, that venue was improper in the Southern District of Texas, that he was not properly served, and that VCU was a necessary party that was not joined. (Doc. 7.) The Court denied that motion in a hearing on July 15, 2021. Now, Wernz has filed a second motion to dismiss, asserting that the Court lacks subject matter jurisdiction.

## II. STANDARD OF REVIEW

"[T]he federal courts have limited subject matter jurisdiction and cannot entertain cases unless authorized by the Constitution and legislation." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996). As a result, objections regarding subject matter jurisdiction can neither be waived nor forfeited. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). A party can challenge subject matter jurisdiction via Federal Rule of Civil Procedure 12(b)(1). FED. R. CIV. P. 12(b)(1).

There are two kinds of 12(b)(1) motions: facial attacks and factual attacks. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). A facial attack occurs when the defense challenges the court's subject matter jurisdiction based on the allegations in the complaint. *Id.* There, the court must take the allegations in the complaint as true and analyze jurisdiction based on those

3

allegations. *Id.* A factual attack occurs when the defense challenges subject matter jurisdiction by submitting additional evidence. *Id.* There, the plaintiff must respond with evidence to prove that subject matter jurisdiction exists by a preponderance of the evidence. *Id.* The plaintiff has the burden of proof because there is a presumption against jurisdiction. *Coury*, 85 F.3d at 248 (citing *Strain v. Harrelson Rubber Co.*, 742 F.2d 888, 889 (5th Cir. 1984)).

Here, Wernz has submitted outside evidence to demonstrate that the Court lacks jurisdiction. Consequently, this Motion presents a "factual attack," and the Court may consider the complaint, undisputed facts in the record, and the Court's resolution of disputed facts. *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996); *see Coury*, 85 F.3d at 249 ("In making a jurisdictional assessment, a federal court is not limited to the pleadings; it may look to any record evidence, and may receive affidavits, deposition testimony or live testimony concerning the facts underlying the citizenship of the parties.").

**III.   ANALYSIS**

Wernz's sole argument is that the Court lacks subject matter jurisdiction. In Elkins' Response, however, she objects to Wernz's documentary evidence and brings an associated motion for sanctions. Consequently, before addressing the merits of Wernz's Motion, the Court must evaluate Elkins' objection and request for sanctions.

*A.  Elkins' Objection to Wernz's Documentary Evidence and Motion for Sanctions*

Elkins objects to Wernz's documentary evidence and moves for sanctions because some of the documents that Wernz relies on in his Motion were not in his Rule 26(a) disclosures. A party must include in his initial disclosures a copy or description "of all documents, electronically stored information, and tangible things that [he has] in [his] possession, custody, or control and may use

4

to support its claims or defenses, unless the use would be solely for impeachment[.]" FED. R. CIV. P. 26(a)(1). If a party fails to provide that information, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Rule 37(c)(1) also provides that "[i]n addition to or instead of [prohibiting a party from exploiting that information], the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi)." *Id.* The parties here do not go into detail regarding the discrepancies between Wernz's Appendix and his initial disclosures, but it seems that the following pieces of evidence appear in Wernz's Motion but not his disclosures: (1) Wernz's affidavit; (2) documents regarding Elkins' purchase of her Virginia home; (3) documents regarding Elkins' sale of her Texas home; and (4) several personal e-mails between Wernz and Elkins.

Despite the apparent mismatch between Wernz's Appendix and his disclosures, the Court must deny Elkins' objection and associated motion for sanctions. "Subject-matter jurisdiction can never be waived or forfeited." *Gonzalez*, 565 U.S. at 141. It would defeat this foundational principle if the Court denied Wernz's jurisdictional objection based on non-compliance with initial disclosure rules. Such a denial would amount to a declaration that Wernz essentially "forfeited" his objection. And Elkins, for her part, directs the Court to no case in which a court has refused to consider evidence on subject matter jurisdiction due to non-compliance with Rule 26(a). Additionally, the Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The Court could hardly discharge this obligation if its review was

5

circumscribed by the scope of Wernz's initial disclosures. *Cf. Diaz v. Castro*, 122 F. Supp. 3d 603, 608 (S.D. Tex. 2014) (describing the district court's authority to evaluate evidence and consider whether it has subject matter jurisdiction as "significant"); *cf. Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (noting a district court's "authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue"). A party's initial disclosures cannot limit the Court's review of its own jurisdiction. As a result, the Court **DENIES** Elkins' objection and associated motion for sanctions.

B.  *Wernz's Motion to Dismiss for Lack of Subject Matter Jurisdiction*

Having disposed of Elkins' objection, the Court can turn to Wernz's argument on subject matter jurisdiction. Ultimately, the Court holds that it lacks jurisdiction in this case.

Elkins' lawsuit consists entirely of state law claims; the only basis for jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332. (Doc. 1 at ¶¶ 1–3.) For diversity jurisdiction, there must be complete diversity of citizenship between the parties when the complaint is filed. *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974). A person's citizenship is determined by their domicile at the time of filing. *Coury*, 85 F.3d at 248. "A person acquires a 'domicile of origin' at birth, and this domicile is presumed to continue absent sufficient evidence of change." *Acridge v. Evangelical Lutheran Good Samaritan Soc.*, 334 F.3d 444, 448 (5th Cir. 2003) (citing *Palazzo v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000)). When a person relocates, however, their domicile can change too. Upon relocation, the presumption of continuing domicile can be overcome by demonstrating "both (1) residence in a new state, and (2) an intention to remain in that state indefinitely." *Id.* "There is no durational residency requirement in the establishment of domicile; once presence in the new state and intent to remain are met, the new domicile is instantaneously established." *Id.*

6

Several factors affect the Court's determination of domicile, including "the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for [their] family." *Coury*, 85 F.3d at 251. Still, "[n]o single factor is determinative." *Id.* Instead, the Court must "weigh all factors equally[.]" *Acridge*, 334 F.3d at 448. "[S]tatements of intent, either to remain in a previous domicile or to establish a new one, are 'entitled to little weight' if they conflict with the objective facts." *Id.* (citing *Coury*, 85 F. 3d at 251). And while the ultimate burden of proof on the issue of citizenship lies with the party asserting jurisdiction, the party attempting to show a change in domicile (here, Wernz), "assumes the burden of going forward on that issue." *Coury*, 85 F.3d at 250.

The following facts are not in dispute: Wernz was a citizen of Virginia at the time of filing; Elkins was a citizen of Texas before she moved to Virginia; Elkins took up residence in Virginia when she moved to Richmond to work at VCU; and Elkins continued to reside in Virginia through the time of filing. The only remaining question, then, is whether Elkins intended to remain in Virginia indefinitely after she began residing there such that her domicile changed to Virginia before filing. If the answer to that question is "yes," then both parties were citizens of Virginia at the time of filing and this suit lacks complete diversity. If the answer to that question is "no," then Elkins remained a citizen of Texas and this Court can exercise diversity jurisdiction.[1]

Wernz points to several pieces of evidence to demonstrate that Elkins changed her domicile to Virginia. In February 2020, Elkins signed a contract to work as a "Lead Data Scientist" in the Department of Health Administration at VCU. (Doc. 20-2 at 4–6.) In March 2020, Elkins packed

---

[1] There is no dispute regarding the amount-in-controversy.

up her belongings and moved from Texas to Virginia. (Doc. 20-1 at ¶ 9.) In April or May of 2020, Elkins took out a mortgage and bought a house in Richmond. (Doc. 19-1 at 5, 12–17.) In May 2020, Elkins moved into her house in Richmond. (*Id.* at 5.) In August 2020, Elkins sold her home in Texas. (*Id.* at 19–20.) And when Elkins filed this lawsuit on May 3, 2021, she still owned her house in Virginia and resided therein. (*Id.* at 6.) Based on these objective indicia of intent, Wernz contends that Elkins intended to permanently reside in Virginia when she moved to Richmond. Wernz also augments these objective indicia of intent with several of Elkins' e-mails to him:

| | |
|---|---|
| **February 11, 2020** | Elkins writes that she will eventually need space for her mother to move in with her, because her father is in poor health and both of her parents "adamantly refuse to live in Texas." (Doc. 19-1 at 34.) |
| **May 7, 2020** | "Only gratitude and excitement to get out of here [Texas]. … Hopefully soon, a plan to move to my new life!" (*Id.* at 26.) |
| **May 13, 2020** | "So excited. F[***] everything I own. I get up there [to Virginia] asap." (*Id.* at 36.) |
| **May 14, 2020** | "If I didn't have my entire academic history amongst all these drives, that whole burning the house down bit to hurry up and move (and see Christian!!!) would be my next course of action." (*Id.* at 32.) |
| **May 16, 2020** | "I torch it all [referring to Elkins' possessions] to get there [to Virginia] soon." (*Id.* at 31.) |
| **May 19, 2020** | "You have no idea how meaningful it was to me when you immediately insisted you help me move. This place [Texas] eats my soul." (*Id.* at 29.) |
| **June 12, 2020** | Elkins e-mailed Wernz a list of "Signs You're On The Right Path (Even If You Aren't Sure)" and commented: "This is me (attached) only since I met you and moved to this beautiful town [Richmond, Virginia]. I wake up every day excited now. I look forward to my future." (*Id.* at 39.) |
| **June 19, 2020** | "We may have had a rocky start and still have some big obstacles to overcome, but I meant it when I said I'd rather |

8

|  |  |
|---|---|
|  | die homeless on the streets here [in Virginia] than have to spend one more year in Texas. Now I just gotta [hustle] to keep this perfect life." (*Id.* at 23.) |
| **June 19, 2020** | Elkins sent Wernz a screenshot of a Facebook post where she wrote: "I really love my new job. I love my new house. I love the people I work with. I love this city [Richmond, Va.]." (*Id.* at 23.) |
| **July 3, 2020** | Elkins sent Wernz a photo of three people holding large guns and wearing head-to-toe stars and stripes and commented: "This is one of my only friends in Texas. You can see why if this was my friend that I needed out of there." (*Id.* at 38.) |

Extrapolating from these communications and the objective indicia of Elkins' intent, Wernz contends that Elkins switched her domicile to Virginia before filing suit.

Elkins, meanwhile, musters her own evidence to suggest that she never intended to stay in Virginia. Elkins avers that she is registered to vote in Texas, uses a Texas driver's license, keeps her car registered in Texas, maintains a bank account in Texas, takes remote classes and certifications in Texas, and received unemployment benefits in Texas. (Doc. 20-1 at ¶ 13.) Elkins adds that she has an extensive network of friends and family in Texas, but no such network in Virginia, and that she is politically and socially active in Texas, but undertakes no such activities in Virginia. (*Id.*) Elkins further declares that she had her property from her VCU office shipped to Texas for safekeeping, and that the only reason that she sold her Texas house was that she could not pay for two houses at once. (*Id.* at ¶¶ 10, 13.) Elkins specifically states that she "never intended to make her Domicile Virginia and . . . always intended to make [her] home in Texas where the rest of [her] family . . . live[s]." (*Id.* at ¶ 13) Elkins also explains her e-mails to Wernz by describing some of them as jokes and others as indicating her annoyance with her living situation in Texas. (Doc. 20-1 at ¶ 14.) Finally, the Court notes that Elkins' contract with VCU had an explicit end date of November 9, 2020. (Doc. 20-2 at 4.)

9

The Court's task in reviewing this evidence is ostensibly simple: pile these facts onto a double-pan balance and see which way the scale leans. Ultimately, the Court finds that the scale leans toward Wernz. By buying a house in Richmond and selling her house in Texas, Elkins indicated that she intended to remain in Virginia indefinitely. Indeed, Elkins' suit is predicated on her allegation that she would not have moved to Virginia but-for Wernz's alleged misrepresentations regarding the long-term nature of the VCU position. Elkins told VCU Employee Relations several times "that she never would have accepted the VCU position if she knew that it was a temporary job." (Doc. 20-1 at 19.) After all, "stable funding was the most important thing for her to consider[.]" (*Id.*; *see* Doc. 1 at ¶ 18.) Elkins also told Wernz that "a work contract for as long as possible and the active pursuit of future funds . . . [are] the absolute main deciding factor[s] in what job [she will] take." (Doc. 20-2 at 16.) And Elkins admits in her Complaint that "had Wernz not told [her] that a contract with no end date was being prepared she would not have accepted the offer[.]" (Doc. 1 at ¶ 23.) Elkins cannot have it both ways: claiming in one breath that she did not intend to live in Virginia indefinitely, while claiming in the next that promises of a permanent position were necessary to get her to move to the state. Finally, Elkins revealed that she viewed her move as permanent in her communications with Wernz, writing: "I meant it when I said I'd rather die homeless on the streets here [in Virginia] than have to spend one more year in Texas. Now I just gotta [hustle] to keep this perfect life." (Doc. 19-1 at 23.) Taken together, these facts indicate that Elkins intended remain in Virginia indefinitely when she moved to Richmond.

That is not to say, however, that Elkins' position is groundless. Elkins indicates continuing ties to Texas through her voter registration, car registration, driver's license, bank accounts, social networks, approach to unemployment benefits, and decision to take remote classes in Texas.

10

Furthermore, Elkins' statements regarding her lack of intent to stay in Virginia are entitled to some weight. But even though those statements can evince intent, "the actual fact of residence and a real intention of remaining there, as disclosed by [the plaintiff's] entire course of conduct, are the controlling factors in ascertaining [her] domicile." *See Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 555–56 (5th Cir. 1985) (quoting *Stine v. Moore*, 213 F.2d 446, 448 (5th Cir. 1954)). Here, the indicia of Elkins' intent to remain in Virginia—particularly her purchase of a house there, sale of her house in Texas, representations regarding the importance of a long-term position, and messages to Wernz—indicate that she intended to remain in Virginia indefinitely after moving there.

Elkins also raises a few additional counterarguments that the Court must address. First, Elkins contends that "[t]he fact that [Wernz] moved [Elkins] from Texas to Virginia, where he instructed her to buy a home near the campus of [VCU] and obtained her power of Attorney in Fact to settle the transaction is not probative of anything other than [Wernz's] own assumption of the duties of a fiduciary[.]" (Doc. 20 at 11.) This argument is baseless. Elkins' decision to buy a home in Richmond plainly indicates her intent to reside in Virginia indefinitely. And the cases that Elkins cites to support her position provide no safe harbor. *See Belliveau v. Barco, Inc.*, 987 F.3d 122, 132 (5th Cir. 2021) (holding that there was no fiduciary relationship between an inventor and a licensee in an intellectual property dispute); *see Gadin v. Societe Captrade*, 2009 LEXIS 51561, at *9 (S.D. Tex., June 16, 2009) (analyzing a claim for breach of fiduciary duty between two members of a limited liability corporation). Second, Elkins asserts that Wernz "is estopped [from making] any assertions concerning [her] intent to change her Domicile from Texas to Virginia since any change on [her] part was induced by [his] fraudulent representations." (Doc. 20 at 9.) But Elkins cites no case where a court ignored a plaintiff's change in citizenship because it was

11

fraudulently induced by a defendant who was not acting with diversity jurisdiction in mind. The one case that Elkins cites to support her stance—*Cooper Industries*—has nothing to do with jurisdiction, and instead addresses whether a fraudulently induced loan is voidable or void under Texas law. *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 876 F.3d 119, 128–32 (5th Cir. 2017). Finally, Elkins argues that the Court may resolve jurisdiction solely by crediting the allegation in her Complaint that she "is a resident and citizen of the City of Bryan, County of Brazos, State of Texas[.]" (Doc. 20 at 12, Doc. 1 at ¶¶ 1–3.) Wernz mounts a factual attack on jurisdiction, however, so "no presumptive truthfulness attaches to [Elkins'] jurisdictional allegations[.]" *See Evans v. Tubbe*, 657 F.2d 661, 663 (5th Cir. 1981). Thus, Elkins' counterarguments fall short.

Overall, then, the Court finds that Elkins changed her domicile from Texas to Virginia when she moved to Richmond to take the position at VCU. She sold her house in Texas, bought a house in Virginia, made clear that long-term stability at VCU was critical to her decision-making process, and expressed to Wernz on several occasions that she wanted to remain in Virginia. These indicia reveal Elkins' intent to remain in Virginia indefinitely. And Elkins did not change her domicile again after arriving in Virginia. As a result, the Court holds that it lacks diversity jurisdiction over this case because Elkins and Wernz were both citizens of Virginia at the time of filing. The Court must therefore **GRANT** Wernz's Motion to Dismiss and **DISMISS** Elkins' claims **WITHOUT PREJUDICE**.

## IV.   CONCLUSION

For the reasons described above and on the record at the hearing, the Court **GRANTS** Wernz's Motion and **DISMISSES** Elkins' claims **WITHOUT PREJUDICE**. *See Sun Packing, Inc. v. XenaCare Holdings, Inc.*, 924 F. Supp. 2d 749, 751 (S.D. Tex. 2012) (citing *Hitt v. City of*

*Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)) ("Dismissal of a plaintiff's case because the court lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction.").

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this 21st day of January, 2022.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE